**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In Re:

Kalamazoo Candle Company, LLC

Debtor.

_____/

Case No:  26-01606
Chapter 11
Hon. Scott W. Dales
Filed On: May15, 2026

## DECLARATION OF ADAM MCFARLIN

I, David Adam McFarlin, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the sole member and manager of Kalamazoo Candle Company, LLC ("**KCC**").

2.      As the manager, I am in charge of KCC's day-to-day operations.

### Background

3.      The idea for KCC originated in 2013 with my vision of building a better candle, from hand, using premium American made materials, that are sustainably sourced.

4.      I was 30 years old living in a small single bedroom I rented from the owner of the house. I didn't have many resources to fund my vision so my first candles were made in a crockpot on a folding table next to my bed.

5.      On October 6, 2013, I sold my first candle to a wholesaler and began doing business as KCC.

6.      In 2014, I incorporated KCC and hired my first employee (who stayed with KCC for eight years).

7.      KCC quickly earned a reputation for producing high quality candles and sales flourished – first in small independent stores and later into larger national chains.

8.      Over the first four years, KCC grew from a bedroom enterprise to larger and larger production facilities.  By 2018, KCC leased a 5,000 square foot warehouse.

9.      In 2018, KCC also opened its first retail store in downtown Kalamazoo ("Kalamazoo Store").  The Kalamazoo Store was an instant success.  It generated a profit, allowed KCC to maintain and grow its symbiotic connection with the Kalamazoo community, and became a destination attraction.

10.     From 2018 until 2020, KCC continued to experience increased growth in wholesale and retail sales.  The COVID slump significantly reduced retail sales in 2020, but when restrictions eased sales quickly rebounded.

11.     In 2021, the Kalamazoo Store experienced its highest revenue year of approximately $500,000.00.  The Kalamazoo Store's success inspired a push for retail expansion. From 2021 through 2022, KCC opened additional retail stores in South Haven, Portage, and Byron Center.

12.     KCC had the products, systems, and processes to successfully expand its retail stores.  However, the logistics of hiring, training, and managing a rapidly expanding workforce over an extended geographic area also provided new administrative challenges and expenses. Ultimately, the administrative expenses required to operate four different locations resulted in reduced profitability.

13.     In 2022-2023, in addition to the administrative expenses required to operate four retail locations, KCC also experienced increased R&D costs for its wholesale customers.  KCC's larger national customers challenged KCC to expand its product lines to take on more shelf space. The costs of the R&D to develop new products, source new ingredients and containers, and acquire the raw products to produce the additional product lines reduced profitability.

14. To manufacture the additional product lines, KCC was forced to expand its manufacturing and warehouse facilities. KCC leased a 15,000 square foot warehouse. The warehouse was larger than KCC needed, but there was limited availability at that time and I hoped that with sales increasing KCC would grow into the entire space. In the short-term, the additional rent reduced further reduced profitability.

15. In 2023, Adelly Enterprises, LLC ("AE"), a holding company owned by my wife and I, purchased the real estate where the Kalamazoo Store operates.

16. Finally, in 2022-2023, profitability was further reduced by the impact of post-COVID inflation. For its large national wholesalers, KCC typically sets its prices 12-18 months in advance of production. Significant inflation during those years meant that KCC's cost-of-goods sold increased faster than KCC could increase prices.

17. Sales spiked in 2024 to approximately $2.2 million, however, approximately $334,000.00 of the $2.2 million were from a one-time customer.

18. In 2025, sales dropped to approximately $1.5 million. KCC took proactive measures to minimize the impact of the reduced sales, including consolidating retail operations into one facility, reducing non-core overhead, diversifying wholesale revenue channels, expanding its DIY in-store candle experience, adding a "mock-tail" lounge in the Kalamazoo Store, streamlining distribution, and introducing new collaborations with other candle manufacturers.

19. KCC's consolidation takes it back to its roots – sales are primarily concentrated in a number of large wholesale customers with one profitable, community centered, retail store (the Kalamazoo Store).

20.    While KCC was transitioning through its consolidation, it relied on a number of Merchant Cash Advance ("MCA"), credit processing advances, and payroll advances to fund operating shortages.

21.    I believe that under its new consolidated structure, KCC can operate profitably. However, KCC cannot afford the debt service from the MCA lenders, credit advances, and terminated leases from the closed retail stores.

22.    In May of 2026, while KCC was reviewing options to resolve the MCA loans and terminated leases, Fora, an MCA lender, began intercepting KCC's credit card sales.

23.    KCC cannot operate without its credit card sales.  Accordingly, it made the hard decision to file its Chapter 11, Subchapter V, Bankruptcy Petition.

24.    Historically, KCC generates approximately 50% of its sales between September and December.  KCC's budget will be tight during the first two months of its Chapter 11.  In order to help reduce costs, I voluntarily reduced my salary for the duration of the Chapter 11 proceeding.

25.    I believe that KCC, operating under its newly consolidate format, can develop a successful Chapter 11 Plan, which will allow it to reduce its debt structure while still paying creditors more than they would receive if KCC were to liquidate.

### Financial Condition

26.    I manage KCC's day-to-day finances.

27.    KCC's year-end financials and tax records are completed by Alan C. Sell, CPA.

28.    I reviewed KCC's assets in anticipation of its bankruptcy filing.  Based on my knowledge of KCC's assets and the candle manufacturing industry, I believe that KCC's assets

have an aggregate estimated liquidation value of less than $150,000.00.[1] KCC's assets primarily consist of equipment and machinery for manufacturing candles, inventory, and accounts receivable. KCC does not own any real estate or vehicles.

29.     KCC's total non-contingent liabilities at the Petition Date are estimated at $1,315,742.00,[2] including a first position secured debt to Horizon Bank of approximately $291,000.00. KCC also guaranteed the mortgage from 1st Source to AE with a balance of approximately $700,000.00. KCC's liabilities include additional secured claims totaling approximately $410,000.00, estimated priority tax claims of approximately $41,000.00, and estimated general unsecured claims of approximately $607,000.00.

30.     Based on the estimated liquidation value of KCC assets and its estimated liabilities, if KCC liquidated its assets, then it appears that Horizon Bank, as the first priority secured creditor, would receive all of the liquidated proceeds. No other creditors would receive payments.

31.     I produced the cash flow projection, which is attached to KCC's Motion for Cash Collateral as "Exhibit A."

32.     Based on the cash flow projection, I believe that KCC, by reducing or eliminating ongoing payments to KCC's wholly unsecured creditors, can operate at net neutral or net-positive while it seeks to reorganize under Chapter 11, Subchapter V, of the United States Bankruptcy Code.

33.     I also believe that with KCC's consolidated operations, KCC can successfully develop a plan of reorganization that allows KCC to operate profitably while paying KCC's creditors more than they would receive in a liquidation.

---

[1] Excluding the real property owned by AE, which has an estimated value of approximately $850,000.00.
[2] Excluding KCC's contingent guaranty of the loan from 1st Source Bank to AE, with an estimated balance of $761,906.00.

## First Day Motions

34.     I have reviewed the First Day Motions and affirm that the facts set forth therein are true and correct to the best of my knowledge.

35.     I believe that the relief sought in each of the First Day Motions: (i) is necessary to enable KCC to operate in its Chapter 11 with minimum disruption of its operations while it seeks to reorganize; (ii) is necessary to protect its Estate from loss in value; (iii) constitutes critical elements in achieving a successful restructuring process; and (iv) best serves its Estate and its creditors.

### A.     Cash Collateral Motion

36.     Through its Cash Collateral Motion, KCC seeks Court approval to use cash collateral, including cash on hand, accounts, inventory, and receivables ("**Cash Collateral**").

37.     KCC has an immediate need for use of the Cash Collateral and will suffer irreparable harm if it is not immediately allowed to use Cash Collateral for operations, including, but not limited to, payment of utilities, insurance, employees, and vendors.

38.     I've personally reviewed the Cash Flow Projections attached to the Motion for Cash Collateral.  Based on my personal knowledge of KCC's operations, I believe that the estimates included are reasonable.

39.     Utilizing the Cash Collateral during its Chapter 11 proceeding will allow KCC to maintain its business operations while continually replenishing its Cash Collateral through its ongoing operations.

### B.  Employee Wages Motion

40.     In the ordinary course of its operations, KCC incurs payroll obligations to its employees.  KCC employs nine full and part-time employees.

41.    KCC's payroll, including hourly employee who are paid weekly, is approximately $11,125.00 every two weeks.

42.    The amount of any pre-Petition compensation owed to employees will not exceed $17,150.00 allowed as a priority claim under sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

43.    All employee wages are current as of the Petition Date, provided however, that unpaid wages have accrued between the last payroll period and the Petition Date.

44.    KCC also pays provides certain employee benefits, including paid sick leave.

45.    KCC's employees rely on their employment income to pay necessary personal expenses.  If KCC delays a payroll distribution or benefit, then many of its employees may immediately leave for what they view as more secure employment.  Restaffing would be time-consuming and would result in substantial lost revenue.

C.  Utility Motion

46.    In the ordinary course of its operations, KCC incurs liabilities for utilities, including liabilities to Consumer's Power and Spectrum Internet.

47.    All utilizes, except for April's invoice for Consumers Power for the Kalamazoo Store and the March to April invoices for the closed retail locations, are current as of the Petition Date; provided however, that utilities have accrued between the last invoice and the Petition Date.

## Conclusion

48.    All the facts set forth in this declaration are based on: (i) my personal knowledge of KCC's operations; (ii) upon my review of relevant financial documents; (iii) my opinion based on my experience and knowledge of KCC's operation and financial condition; and (iv) my opinion based on information and analysis provided to me by professionals, such as accountants, financial advisors, and attorneys.

49.     If I were called to testify, I could and would testify competently to the facts set forth herein.

I, Adam McFarlin, declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Dated: 5/14/26                          By: _____

David Adam McFarlin, as
Sole Member and Manager of Kalamazoo
Candle Company, LLC